**UNITED STATES of America,
Appellee,**

v.

**Joseph A. CHASE, Appellant.**

**UNITED STATES of America,
Appellee,**

v.

**Robert H. PARRISH, Appellant.**

**UNITED STATES of America,
Appellee,**

v.

**Wyatt J. ROY, Jr., Appellant.**
**Nos. 10601, 10609, 10728.**

United States Court of Appeals
Fourth Circuit.

Argued Oct. 31, 1966.

Decided Jan. 26, 1967.

454

Louis Koutoulakos, Arlington, Va., for appellant Chase.

John J. Dwyer, Washington, D. C., for appellant Parrish.

T. Emmett McKenzie, Washington, D. C. (Court-appointed counsel), for appellant Roy.

Roger T. Williams, Asst. U. S. Atty. (C. V. Spratley, Jr., U. S. Atty., on brief), for appellee.

Before BRYAN, BELL and WINTER, Circuit Judges.

WINTER, Circuit Judge.

Indicted in a sixteen-count indictment charging conspiracy to violate the statutory prohibitions against interstate transmission of wagering information (18 U.S.C.A. § 1084), traveling in interstate commerce in aid of gambling (18 U.S.C.A. § 1952), and interstate transportation of gambling paraphernalia (18 U.S.C.A. § 1953), and numerous substantive violations, appellants Chase and Parrish were found guilty, by a jury, of the conspiracy count and all substantive counts in which they were charged. Appellant Roy was tried by the court and found guilty of the conspiracy count and not guilty of the two substantive counts in which he was charged in a joint trial with Chase, Parrish and three other co-defendants.[1] The indictment was returned October 6, 1965 by a federal grand jury at Richmond, Virginia. It superseded a fourteen-count indictment returned July 13, 1965 by a grand jury at Newport News. The second indictment extended the alleged period of the conspiracy from January 1, 1962 to and including July 10, 1965; the original in-

---

1. Chase was named as a co-defendant in the conspiracy count (Count 1). As a principal and an aider and abettor (18 U. S.C.A. § 2), Chase was also named as a co-defendant in eight counts charging travel in interstate commerce in aid of gambling (Counts 2, 4, 5–10) and as a co-defendant in seven counts charging interstate transportation of gambling paraphernalia (Counts 3, 11–16).

Parrish was named as a co-defendant in the conspiracy count (Count 1). As a principal and an aider and abettor (18 U.S.C.A. § 2), Parrish was also named as a co-defendant in two counts charging travel in interstate commerce in aid of gambling (Counts 4 and 10) and one count charging interstate transportation of gambling paraphernalia (Count 11).

Roy was named as a co-defendant in the conspiracy count (Count 1). As a principal and an aider and abettor, he was also charged with traveling in interstate commerce in aid of gambling (Count 2) and interstate transportation of gambling paraphernalia (Count 3).

dictment had alleged the conspiracy to exist only from March 16, 1965 to April 5, 1965. The superseding indictment also added two substantive violations to the crimes charged as to Roy, Chase and another who does not appeal. Roy and another co-defendant elected to be tried by the court, and a joint trial was begun on November 8, 1965. Two days later, at the conclusion of the government's case, the district court, on motion of the defendants whose cases were being tried by a jury and on its own motion as to the non-jury defendants, declared a mistrial because a newspaper containing a prejudicial article was found in the jury room and another newspaper also published a prejudicial article and interrogation disclosed that a substantial number of jurors had read both articles. The second trial was begun on February 14, 1966, and resulted in the verdicts, and ultimately the judgments [2] from which these appeals are taken.

The three appellants make numerous assignments of error in the conduct of the trial and the validity of their convictions. Facts germane to each of the contentions will be specially stated, but, at the outset, it is necessary to state in general terms the proof adduced against them.

Early in 1962, Austin G. Carr, a civilian employee of the Navy, was stationed at the Navy Annex, Arlington County, Virginia. At least from the latter part of 1961, Carr supplemented the income from his employment by writing bets on numbers at the Navy Annex. He employed as assistants as many as a dozen Navy employees and paid them in money or free bets. At this time, the operation was backed by a certain Clay, to whom Carr turned over his bets and the money collected. In 1962, a lucky bettor "hit"

a winning number, and Clay was unable to pay the $1,080.00 which the bettor won. Negotiations concerning payment of the bet ultimately culminated in Clay's appearance at Carr's house, accompanied by Appellant Chase and another. An agreement was reached that Carr would hold money which he received from bets that he wrote until he accumulated enough to pay off the winning bet and that, thereafter, he would turn his work over to Chase.

Arrangements were made whereby Chase met Carr at the Annex and, at this meeting, Carr showed Chase a water cooler under which Carr would hide numbers work. Thereafter, Chase was seen by Carr at the Annex on a number of occasions and, on some of them, Chase picked up the work from the water cooler, and sometimes Carr handed the work to Chase directly. Appellant Roy also picked up bets at the Annex from time to time, although at one point in the operation he quit the operation for the express reason that he was running too great a risk in crossing the District of Columbia-Virginia line. The discontinuance lasted only three months.

Settlement between Carr and Chase would be effected each week-end at Carr's home, in the District of Columbia. Usually Chase appeared personally, but from time to time John K. Smith, who was also indicted and found guilty of conspiracy, but who has not appealed, appeared in Chase's behalf.

On August 1, 1964, Carr was transferred to the Main Navy Building in the District of Columbia. When the impending transfer was known, Carr arranged to meet Chase at the Main Navy Building to show him where the work would be hidden. It thereupon became neces-

---

2. On each of the sixteen counts on which he was convicted, Chase was fined $2,500.-00 and committed for five years. Service of the last two years of each term was suspended and the sentences were made concurrent, and not consecutive. On each of the four counts on which he was convicted, Parrish was fined $2,500.00 and committed for eleven months. The sentences were made concurrent and not consecutive, and service of the entire term imposed on each count was suspended. On the single count on which he was convicted, Roy was fined $1,000.00 and committed for eighteen months. He was required to serve six months of the term, and service of the balance was suspended.

sary for Carr to make arrangements to have the work assembled at the Annex and transported to the Main Navy Building for ultimate transmission to Chase. The services of two other individuals, William Triplett, who was indicted for conspiracy and numerous substantive counts, found guilty, and who has not appealed, and Roosevelt Harrison, were procured. Harrison was to assemble the work at the Annex and place it in a marked envelope, and Triplett was to pick up the envelope on one of his regular trips to the Annex and deliver it to Carr at the Main Navy Building. Carr, in turn, delivered the envelope to Chase or Roy.

Triplett became apprehensive that the government vehicle which he was driving was being followed, and he discontinued his messenger service for Carr in March, 1965. Carr then approached appellant Parrish, an employee at the Main Navy Building, and arranged for Parrish to go to the Annex each day and pick up the numbers work. Parrish was to be paid $1.50 per day for his services. Parrish was observed by the agents on several occasions entering the designated room at the Annex and picking up an envelope, which he returned to the Main Navy Building. This activity continued until April 5, 1965, when a raid occurred. Carr, Parrish, and approximately fifty others, but not Chase, were arrested.

Eight days after his arrest, Carr voluntarily appeared at the office of the Provost Marshal in the Main Navy Building and made a statement to an internal revenue service agent which implicated Chase as the backer of the alleged activity. Carr agreed to cooperate in the investigation and, at the request of the agent, communicated with Chase and arranged to resume turning numbers work over to him. From April 5 to July 13, Internal Revenue agents observed two meetings between Chase and Carr and, thereafter, Chase came to Carr's home to pick up the numbers work and effect weekly settlements.

As reasons to reverse the judgments entered in his convictions, Chase advances four contentions. He complains of excessive and prejudicial interference by the district judge in the trial of the case, prejudicial error in the admission of evidence relating to events which occurred after April 5, 1965, the date on which the raid occurred in which Carr and Parrish, and numerous others, were arrested and after which it is contended the conspiracy terminated, erroneous instructions to the jury with regard to the law of conspiracy and a failure to submit the defense of entrapment to them. As a catchall, Chase adopts his co-appellants' contentions and arguments to the extent that they are applicable to him.

Parrish complains of an alleged insufficiency of evidence to support his conviction on any count. Like Chase, he claims reversible error in the conduct of the trial judge and the admissibility of evidence of events after April 5, 1965. He also contends that he was prejudiced by an inaccurate summary of evidence in the district judge's charge to the jury.

Roy makes six contentions. He claims that dismissal of the original indictment terminated the entire prosecution and that he was denied due process of law when the trial court required him to defend himself on the superseding indictment. He claims double jeopardy and denial of due process of law when he was required to go to trial after the mistrial, which he did not request and to which he did not object, was granted. There was error, also, he contends, in a refusal to permit him to inspect the minutes of the proceedings of the Norfolk and Richmond grand juries, although the United States Attorney repeatedly represented that the Norfolk grand jury had kept no minutes, and the minutes of the Richmond grand jury set forth only the testimony of some of the witnesses who appeared before it. Roy complains, also, of the denial of his pretrial motion to require the government to furnish him with a list of witnesses, and the denial of a preliminary hearing before the Richmond grand jury returned its indictment. Lastly, Roy contends that there was insufficient evidence to convict him of the crime of con-

spiracy, the single crime of which he was found guilty.

Certain of the numerous contentions made are applicable only to a single appellant, but applicable to all is the contention of Chase and Parrish that the trial court improperly admitted evidence of events which occurred after April 5, 1965.[3] Because of its general application and because we think it meritorious, we will first turn our attention to it. Additional facts which relate to it require statement.

Carr was arrested April 5, 1965. Some eight days later he concluded to make a clean breast of his participation in the overall operation. To that end he made an oral statement to the federal officers admitting his guilt and incriminating all of appellants. At the instance of the federal officers, he agreed to become a government agent. He communicated with Chase and arranged to resume taking bets for the pool conducted by Chase. Testimony of the taking of bets, delivery thereof to Chase, and settlement therefor, was admitted over objection, as well as testimony of meetings between Chase and Carr at Carr's home, and original betting documents and accounts relating to bets placed after April 5, 1965, recovered in the execution of a search warrant on July 9, 1965.

 It is undisputed that all of the defendants named in the second indictment, except Chase, were arrested on April 5, and that after April 5, *none of the defendants except Chase and Carr, in his role as a government informer, engaged in any betting activities*. The government essentially concedes that a conspiracy ends as to a particular co-conspirator upon his arrest, but the government argues that such arrest does not terminate the conspiracy as to fellow-conspirators remaining at large and continuing their illegal activities. These rules need not be questioned. The fact is that no evidence was adduced at the trial to show that any defendant, or any other person, engaged in any betting activities with Chase after April 5, 1965, except Carr, who did so as a government agent, using government money, supplied to him by federal agents. The conclusion is thus inescapable that, on April 5, 1965, the conspiracy, charged in the indictment to have continued until July 10, 1965, ceased, because Chase could not conspire with himself, and there was no other person with whom he could conspire. Carr, Parrish, Roy, et al., legally could no longer be co-conspirators because they had been arrested. Fiswick v. United States, 329 U.S. 211, 67 S.Ct. 224, 91 L.Ed. 196 (1946); Sandez v. United States, 239 F.2d 239 (9 Cir. 1956). Although the indictment also alleges a conspiracy "with divers other persons, whose names are to the grand jurors unknown," there was no proof of such other persons, known or unknown, and the Court cannot infer that, because once the backer of a gambling operation, Chase continued uninterruptedly as the backer of a gambling operation after the arrests. In this regard, it is significant that the indictment charges no overt act on the part of any defendant occurring after April 5.

 Although a conspiracy may continue even though certain co-conspirators terminate their connection therewith, and may be replaced by other co-conspirators, it cannot be said that this conspiracy continued after April 5, 1965 between Carr and Chase, because it is equally well-established that one who acts as a government agent and enters into a purported conspiracy in the secret role of an informer cannot be a co-conspirator. Sears v. United States, 343 F.2d 139 (5 Cir. 1965); Developments in the Law— Criminal Conspiracy, 72 Harvard Law Review 920, 926 (1959); Note, 13 U. of Miami Law Review 380 (1959); Note, 33 Tulane Law Review 393 (1959). See also, O'Brien v. United States, 51 F.2d 674 (7 Cir. 1931); United States v. Wray, 8 F.2d 429 (D.C.Ga.1925).

---

3. Roy does not specifically advance this contention, but we consider it under the provisions of Rule 52(b), Fed.R.Crim.P.

■■ The government also contends that evidence of events subsequent to April 5, 1965 was properly received to establish knowledge, motive and intent on the part of Chase. Even so, prejudicial error was committed as to Parrish in admission of the evidence. After a conspiracy has ended, acts of a conspirator occurring thereafter are admissible against his former co-conspirators only where they are relevant to show the previous existence of the conspiracy or the attainment of its illegal ends; and subsequent declarations, if otherwise relevant, are admissible only against the declarant. Lutwak v. United States, 344 U.S. 604, 617–618, 73 S.Ct. 481, 97 L. Ed. 593 (1953). That Chase, after the conspiracy with Parrish, et al., had ended, engaged in identical activities with Carr, acting as government agent, sheds no light on whether the previous conspiracy in fact existed nor does it prove attainment of any of its illegal objectives. The acts of Chase, after April 5, thus had no relevancy to the charge against Parrish. What Chase said after April 5, if otherwise relevant, was not admissible against Parrish.

■ In his instructions, the district judge told the jury that a person might become a member of a conspiracy either at its inception or afterwards, and that what was done or said by a co-conspirator thereafter would be admissible against that person, but he failed to limit, carefully and clearly, the jury's consideration of evidence after April 5 to Chase. Thus, the jury was free to rely on Chase's acts and declarations after April 5, 1965, in determining the guilt or innocence of Parrish for his part in the conspiracy which ended on that date. This was clearly erroneous.

■ Roy stands on a somewhat different footing because he was tried by the court and not by a jury. In overruling an objection by Roy's counsel to evidence of events after April 5 the district judge stated, "the Court will only consider evidence against your client that is relevant to him," but nowhere later in the proceedings, nor in stating why he concluded Roy was guilty, did the district judge give any indication that he placed no reliance on the evidence of events after April 5.[4] In other words, the district judge's concept of relevance is nowhere disclosed. Under such circumstances, we can only conclude that a proper regard for Roy's rights requires us to treat his conviction as tainted, absent a clear indication that it was not.

■ In Chase's case, we think the evidence of his acts and declarations after April 5, 1965 were admissible as to him to prove his willingness to participate in the conspiracy with intent to advance its purpose. Intent to promote, manage, establish or carry on a gambling in violation of the laws of Virginia is an element of the crime created by 18 U.S.C.A. § 1952, and knowledge and intent to transmit gambling paraphernalia in interstate commerce are elements of the crime created by 18 U.S.C.A. § 1953. Proof of a conspiracy to violate these statutes requires at least the degree of criminal intent necessary for the substantive offenses themselves. Ingram v. United States, 360 U.S. 672, 79 S.Ct. 1314, 3 L. Ed.2d 1503 (1959). "Where intent and knowledge are essential elements of the crime for which a defendant is being tried, evidence of other transactions, even though criminal in nature, is admissible if the transactions are so connected with the offense charged that they serve to show a general pattern and to prove the necessary criminal intent or guilty knowledge." Kowalchuck v. United States, 176 F.2d 873, 878 (6 Cir. 1949). To like effect are Roe v. United States, 316 F.2d 617 (5 Cir. 1963); Benchwick v. United States, 297 F.2d 330 (9 Cir. 1961); and United States v. Prince, 264 F.2d 850 (3 Cir. 1959). See also, United States v. Ardner, 364 F.2d 719 (4 Cir. 1966). Chase's activities

4. The district judge's statement on finding Roy guilty that the credibility of Carr was the principal issue suggests to us that evidence of Carr's cooperation after April 13, 1965 may well have had an important bearing on his credibility.

after April 5, 1965 were closely connected in time to the conspiracy which existed until that date; they involved Carr, one of the co-conspirators until that date; and they were identical in nature to those charged in the conspiracy indictment. We conclude, therefore, that proof of them, by proof of acts and declarations, was permissible as to Chase to show his intent and knowledge prior to April 5.

The convictions of Parrish and Roy on the conspiracy count of the indictment cannot stand. The conviction of Chase is unassailable.

We must next consider whether the convictions of Chase and Parrish on the substantive counts of the indictment are

valid, and whether the government should be given an opportunity to retry Roy, as against his plea of double jeopardy.

### No. 10,601—Chase's Appeal

Chase was convicted on the fifteen substantive counts of the indictment. Our examination of the record satisfies us that his convictions on Counts 4–16, inclusive, are supported by substantial evidence from which the jury properly could have concluded him guilty, under 18 U.S.C.A. § 2, beyond a reasonable doubt.[5] His convictions on Counts 2 and 3 should be reversed, because of the manifest unfairness of requiring him to defend himself against charges lacking specificity.[6] As to the other counts,

---

5. Error in admitting evidence on the conspiracy charge did not infect the jury's consideration of the substantive counts, as the following references demonstrate. The jury was told, in the district judge's charge: "[Y]ou have just heard the evidence and the argument of counsel in some thirty-three separate distinct criminal cases involving four defendants. * * * Each of these offenses and the evidence applicable thereto should be considered separately by the jury. The fact that you may find all or some of the accused guilty or not guilty of one of the offenses charged should not control your verdict as to any offense charged."

After instructing in regard to the crime of conspiracy, the district judge said, "Now, each of the defendants before you are further charged in one or more counts of violating Section 1952 and 1953, Title 18, of the United States Code. * * * Now, the Court will again, so that there can be no misunderstanding on your part, state that each of these substantive acts, that is all of the charges, the travel and the transportation charges involving all of the defendants, other than Count 1, which is the conspiracy count, are separate and distinct offenses as to each individual defendant and that you should only consider, when you are determining the guilt[y] or the innocence of each of the defendants as to those charges, the evidence that pertains to him insofar as that count is concerned. Any evidence that anybody else may have traveled in interstate commerce in furtherance of this alleged illegal activity insofar as the specific counts are concerned is not evidence that has any bearing whatsoever upon the guilt or innocence of the one named on the particular day referred to in that Count."

The district judge further told the jury that if it found a conspiracy, the act of any conspirator was binding on his co-conspirators under the theory of agency, but he added, "that rule applies only so that you understand it as he is charged with conspiracy. There is no such thing as a theory of agency on these substantive counts. Each has to stand on its own. * * * And I take the pains of explaining the difference on the conspiracy. Once you become a member for a conspiracy purpose, anything anybody does is chargeable to all others because they are co-conspirators, but that rule is not the rule in the substantive counts."

6. Count 2 charges that "on or about January 1, 1962 and *continuously thereafter until on or about August 1, 1964*," Chase, Roy and another did wilfully transmit in interstate commerce and use a facility in interstate commerce between Washington, D. C. and Arlington County, Virginia, to carry on a business enterprise involving gambling in violation of Virginia law. Count 3 charges that *for the same period* the same three defendants wilfully carried and caused to be carried in interstate commerce between Washington, D. C. and Arlington County, Virginia, gambling paraphernalia. In Roy's case, which was tried nonjury, the court granted a motion for judgment of acquittal at the end of all of the evidence on both counts, because they were a "catch-all" and "if the government wants to convict a man * * * they ought to be a little more specific."

Chase sought particulars of these counts. The government's bill of particulars disclosed that the "specific *dates of all travels* between January 1, 1962

there remains, therefore, the contention that the district court improperly and prejudicially interfered in the trial of the case.

■ Our study of the record convinces us that this contention is not well-founded. Significantly, judicial participation in the interrogation of witnesses occurred in most part when counsel for Chase was examining or cross-examining witnesses. Undue and unnecessary repetition in questions, arguing with the witnesses, repeated and groundless motions for mistrial, and general obstreperousness of Chase's counsel were the occasions for judicial participation in the trial. We consider that the district judge, under these circumstances, did no more than perform his proper function as governor of the trial. Fields v. United States, 370 F.2d 836 (4 Cir. 1966); United States v. Godel, 361 F.2d 21 (4 Cir. 1966); Wallace v. United States, 281 F.2d 656 (4 Cir. 1960), cert. den. 370 U.S. 923, 82 S.Ct. 1564, 8 L.Ed.2d 503 (1962); Simon v. United States, 123 F.2d 80 (4 Cir. 1941), cert. den. 314 U.S. 694, 62 S.Ct. 412, 86 L.Ed. 555 (1941).

■ Chase's complaints about the district judge's charge on the conspiracy count are lacking in merit. In the light of our conclusion about the admissibility as to Chase of the evidence of events occurring after April 5, the charge, as to Chase, was unexceptional. The district judge properly refused to submit the issue of entrapment to the jury because there was no evidence that after April 5 Carr supplied Chase's intent to violate the law. To the contrary, overwhelming evidence showed that' Chase had just previously been engaged in similar law violations and was ready and willing to continue them. Butler v. United States, 191 F.2d 433 (4 Cir. 1951).

We affirm Chase's conviction for conspiracy. We reverse Chase's conviction on Counts 2 and 3, without a new trial. We affirm, also, Chase's conviction on the remaining counts of the indictment.

*No. 10,609—Parrish's Appeal*

■ Like Chase, Parrish was also convicted of substantive offenses, two charges of interstate travel in aid of gambling, and one charge of interstate transportation of gambling paraphernalia. Parrish's defense was that he did not know that the materials he carried and those he transmitted related to gambling; but Carr testified otherwise, and there was evidence from government agents that they observed Parrish present when the contents and money placed in envelopes he carried were assembled so that he knew the nature of his missions and the nature of the material he transmitted. Clearly, the jury could have properly determined his guilt beyond a reasonable doubt.

Parrish testified in his own behalf, denying, not that he traveled in interstate commerce carrying envelopes which contained bets on numbers, but that he knew the nature of the material. In an effort to prove that Parrish must have known the contents of the envelopes, Parrish was asked on cross-examination, "Did you know a man by the name of Jones?" and "Do you know specifically a numbers writer in Main Navy by the name of Jones?" Because Jones had not been mentioned in Parrish's direct testimony, nor had he been referred to in early testimony in a way which would, under other circumstances, justify the manner in which Jones' name was suddenly thrust into the trial, Parrish claims reversible error in this questioning.

An objection to the questions was overruled upon the representation by the assistant United States Attorney that the government could prove that Parrish was employed as a runner by a numbers

and August 1, 1964" (emphasis supplied) are not now ascertainable and that the interstate facility in interstate commerce was "the telephone facility of the Chesapeake and Potomac Telephone Company." It follows that Chase was not advised

of the specific acts with which he was charged. Under such circumstances, the government ought not to have been permitted to proceed with proof to sustain those counts.

writer named Jones. When directed to answer, Parrish denied knowing "any number writers." On rebuttal, the government recalled Carr, who testified that prior to April, 1965, Parrish told Carr that he [Parrish] was being paid $1.50 per trip by Jones, and should be paid another $1.50 per trip by Parrish, to pick up "our work, number work" at the Navy Annex. Carr further testifed that thereafter Parrish delivered envelopes to him, marked "C," and envelopes to Jones, marked "J," containing numbers bets.

 Certainly, "nothing is better settled than that a witness, whether a party or not, may not be asked questions as to irrelevant matters on cross-examination for the purpose of contradicting his answers and thus discrediting him." Sutherland v. United States, 92 F.2d 305, 308 (4 Cir. 1937). At the same time, the scope of cross-examination is "generally a matter within the sound discretion of the trial judge * * * and appellate courts are reluctant to set aside lower court judgments upon an assertion that the examination of a witness (even though that witness be the defendant) was permitted to range too far afield." United States v. Hall, 342 F.2d 849, 854 (4 Cir. 1965), cert. den. 382 U.S. 812, 86 S.Ct. 28, 15 L.Ed.2d 60 (1965); Chinn v. United States, 228 F.2d 151 (4 Cir. 1955), See also, United States v. Smith, 342 F.2d 525 (4 Cir. 1965), cert. den. 381 U.S. 913, 85 S.Ct. 1535, 14 L.Ed.2d 434 (1965).

 We cannot say that the district judge abused his discretion in the cross-examination of Parrish that he permitted. Parrish on direct examination denied being a runner of numbers bets for Carr. To discredit Parrish, the government was prepared to show, and did show, that by Parrish's own admission he solicited and accepted employment by Carr at the same time that he was actually employed by Jones. The questions asked were within the permissible scope of cross in the context of Parrish's prior employment by Jones.

In his charge, the district judge summarized to some extent the government's evidence. On request, as Parrish concedes in his brief, the district judge "gave a succinct statement of the defense." No claim of gross error in summarization is claimed, and the district judge pointedly cautioned the jury that its recollection of the evidence should control its deliberations, not that of the court or counsel. We see no merit in Parrish's contention that the charge was prejudicial to him.

We reverse Parrish's conviction for conspiracy and award the government a new trial. We affirm Parrish's conviction on the remaining counts of the indictment.

### No. 10,728—Roy's Appeal

For the reasons stated, we reverse Roy's conviction for conspiracy, the only charge of which he was found guilty. We must decide, however, whether he may be retried. This depends upon whether his claim that he was twice placed in jeopardy is meritorious. Because we conclude it is not, we must decide also whether there is merit in his other assignments of error so that the denial of any of his rights is redressed before retrial.

 Roy's contention that he cannot be retried is two-fold. First, he claims that the dismissal of the indictment returned by the Norfolk grand jury terminated the prosecution and that, thereafter, he could not be reindicted for conspiracy by the Richmond grand jury for a conspiracy allegedly covering a period of time which included the period of the conspiracy charged by the Norfolk grand jury. Reliance is placed on Rule 48, Fed.R.Crim.P. It is true that Rule 48(a) states that a United States Attorney may, by leave of court, file a dismissal of an indictment "and the prosecution shall thereupon terminate," but the authorities are replete that such a dismissal is without prejudice. Mann v. United States, 113 U.S.App.D.C. 27, 304 F.2d 394, cert. den. 371 U.S. 896, 83 S.Ct. 194, 9 L.Ed.2d 127 (1962); United States v. Becker, 221 F.Supp. 950 (W.D.Mo. 1963); United States v. Shanahan, 168 F.Supp. 225 (S.D.Ind.1959); United

States v. Bowles, 183 F.Supp. 237 (D.Me. 1958); United States v. Garces Dorrego, 17 F.R.D. 340 (D.Puerto Rico 1955). According to the rule, it is only when a trial has begun and jeopardy has attached that a dismissal may not be filed without a defendant's consent. Second, Roy claims double jeopardy in the second trial on the indictment returned by the Richmond grand jury because, he contends, a mistrial was erroneously declared as to him, thereby precluding further prosecution. To assess this claim, we turn first to the circumstances under which a mistrial in the first trial was declared.

The first trial began November 8, 1965. On the morning of November 10 when, apparently, the government's case in chief was complete, and court had convened, but the jury was still in the jury room, counsel for one of the defendants (not an appellant here) reported that he and the other attorneys had found a newspaper in the jury room the afternoon before, after the jury retired. That newspaper carried an article about the trial, bearing the headline, "Witness Links Chase to Gambling" and, in the body of the article, stated that Chase was known as a veteran gambler to the Gambling Squad of the Washington police. The same attorney also reported that a Washington morning paper of November 10 carried another article describing Chase as a convicted gambler. This attorney then moved the court to inquire of the jury as to whether any member had read either article. He stated it would be his position "for *these* defendants" that if any member of the jury had read either article a mistrial should be granted.

Counsel for Chase stated that he thought the discovery of the paper of November 9 in the jury room, describing Chase as a veteran gambler, was grounds for a mistrial. The court then called on counsel to restate formally for the record their motions. Thereupon, the first attorney who had reported the discovery of the newspaper said he had no motion. Counsel for Chase moved for a mistrial,

coupled with a motion for an inquiry to the jury as to whether any member had read either article. Counsel for Parrish joined in Chase's motion for a mistrial, but disassociated himself from the request for interrogation of the jury. The court then called on counsel for Roy, who said that he had no motion and "I have no business with the jury." After hearing from counsel for the government and further colloquy generally, in which counsel for Roy did not participate, the district judge had the jury escorted to the courtroom. He asked them collectively if anyone had read the newspaper article of November 9, and he received unanimous affirmative response. He then asked if any one had read the newspaper article of November 10 and nine members of the jury responded affirmatively. The district judge explained to the jury that it would be necessary for him to declare a mistrial, and then excused the jury and let them retire.

After the jury's departure, the district judge stated formally for the record that, because practically all of the jurors had read both articles, he declared a mistrial in the case for all of the defendants who had a jury trial. Then he said, "Now, what does the defendants want to do that did not have a jury trial? Well, I am not even going to ask you. I am going to declare a mistrial on it * * *," assigning as a reason that he ought not in fairness to the other alleged conspirators pronounce his judgment in the case of any of the alleged non-jury co-conspirators prior to allowing the guilt or innocence of all defendants to be adjudicated at the same time. Later in the proceedings, the judge stated that he granted a mistrial because he thought his failure to do so would be "harmful or prejudicial, either way," but that he might have decided the non-jury cases by hearing the rest of the evidence and would have done so had the non-jury defendants been charged only in a substantive count.

Counsel and the court then proceeded to a discussion of a new trial date. During the course of the discussion, counsel for the other non-jury defendant stated

for the record that he did not move for a mistrial. Counsel for Roy made no such statement, and neither attorney representing a non-jury defendant asked that his client's case be severed.

 Unquestionably, the district judge was correct in declaring a mistrial for the jury defendants, because there was manifest necessity for the act. Simmons v. United States, 142 U.S. 148, 12 S.Ct. 171, 35 L.Ed. 968 (1891); United States v. Perez, 9 Wheat. 579, 6 L.Ed. 165 (1824). Whether the same is true as to Roy is a closer question to decide. The three latest decisions on double jeopardy, Gori v. United States, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961); Downum v. United States, 372 U.S. 734, 83 S. Ct. 1033, 10 L.Ed.2d 100 (1963); and United States v. Tateo, 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964), are not precisely applicable to Roy's case on their facts. Gori recognized that "[w]here, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant's consent and even over his objection, and he may be retried consistently with the Fifth Amendment." Id. 367 U.S. at p. 368, 81 S.Ct. at 1526.[7] Downum stated the test somewhat more stringently when it said, "At times the valued right of a defendant to have his trial completed by the particular tribunal summoned to sit in judgment on him may be subordinated to the public interest—*when there is an imperious necessity to do so.*" (emphasis supplied) Id. 372 U.S. at p. 736, 83 S.Ct. at 1034.[8] Tateo adds little to what was said in Gori and Downum, for present purposes, except to demonstrate that retrials are permissible for a variety of reasons under a variety of circumstances.[9]

The grant of a mistrial for Roy was manifestly not at the request of or for the benefit of the government, a factor which underlies the holding in Downum. Indeed, the government had apparently concluded its case against Roy, and it could have suffered great inconvenience on retrial should its witnesses depart from their testimony at the original trial and thus create grounds of impeachment and questions of credibility. From the standpoint of the jury defendants, the failure to grant a mistrial as to the non-jury defendants might seriously hamper their ability to obtain a fair retrial from an untainted jury should either or both of the non-jury defendants be found guilty. The public press had already evidenced its interest in the proceedings. It would not have been unreasonable for the trial judge to have anticipated that a guilty verdict as to either non-jury defendant would receive wide publicity having the effect of disqualifying veniremen who read it, particularly when the court and all counsel contemplated a prompt retrial. The conspiracy case, as well as two substantive counts, was a joint trial of a crime which could be committed only by two or more persons. It was permissible to grant a mistrial as to Roy to protect the rights of the jury defendants. The fact of a joint trial alone was a consider-

---

7. In *Gori* the district judge declared a mistrial, *sua sponte* and without approval or objection from the defendant, during presentation of the government's case in a prosecution for receiving and possessing goods stolen in interstate commerce. The mistrial was declared because the judge thought it necessary to protect the rights of the accused. Why he thought so was unclear from the record. Defendant's retrial was permitted.

8. In *Downum* a mistrial was declared in a joint trial as to defendant, the only jury defendant, during the government's case and at the request of the government, be-

cause a witness, *essential for only two of the six counts in which defendant was indicted,* was not present. Defendant's retrial was not permitted.

9. In *Tateo* it was held that a defendant, who had successfully attacked his initial guilty plea in post-conviction proceedings, could not successfully assert double jeopardy on retrial. The dissenters (Goldberg, Black and Douglas, JJ.) expressed the view that the language of the majority "departs from Downum and in so doing substantially weakens the constitutional guarantee." 377 U.S., at 469, 83 S.Ct. at 1591.

able factor permitting a retrial in the case closest on its facts to Roy's case. Scott v. United States, 91 U.S.App.D.C. 232, 202 F.2d 354 (D.C. Cir. 1952), cert. den. 344 U.S. 879, 73 S.Ct. 176, 97 L.Ed. 681 (1952). See also, Himmelfarb v. United States, 175 F.2d 924 (9 Cir. 1949), cert. den. 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527 (1949).

From Roy's standpoint, there was also a reason to grant a mistrial. Roy could have been helped, as well as hurt, by the defenses of his alleged co-conspirators. Whatever help he could gain from their testimony, and some did testify on retrial, he could hardly hope to avoid their invoking immunity as witnesses until such time as they testified in their own defense. Certainly, Roy manifested no objection, as did the other non-jury defendant, to the declaration of a mistrial; nor did he request a severance of his case. Silence as to either, alone, has been held to bar successful assertion of double jeopardy. Mullin v. United States, 356 F.2d 368 (D.C. Cir. 1965); Scott v. United States, supra.

■ On this record, aside from waiver, we conclude that the district judge did not abuse his discretion in declaring a mistrial as to Roy, so that Roy cannot properly invoke the guarantee against double jeopardy. Unquestionably, *Downum* and *Gori* make clear that doubt as to the validity of a court's declaring a mistrial shall be resolved in favor of the accused. Indeed, the majority opinion in *Downum* and the dissenters in *Gori* and *Tateo* make the point more strongly— that the risk of erroneous action in declaring a mistrial should always be on the government. Here, in a joint trial, we conclude that there were compelling reasons from the viewpoint of the jury defendants and good reason from the viewpoint of Roy to justify the action taken, and also that to do complete justice to the jury defendants, the trial judge could declare a mistrial as to all defendants. Moreover, there is not the slightest sug-

gestion that the convenience or benefit of the government was sought to be served. The requirements of *Gori, Downum* and *Tateo,* as to when a mistrial does not give rise to double jeopardy, were fully met.

■ Roy's remaining contentions require little discussion. There was no error in denying him the right to inspect the minutes of the Norfolk and Richmond grand juries. His announced purpose in seeking inspection was to discover discrepancies in the testimony of witnesses who appeared before both. That such an objective could not be accomplished when, as the attorneys for the government repeatedly represented, there were no minutes of the proceedings before the Norfolk grand jury, is manifest. Even if its proceedings were reported, the mere *possibility* that a witness's testimony before both grand juries differed, or the mere *possibility* that his testimony before a grand jury differed from his testimony at trial, would be insufficient reason to pierce the veil of secrecy which protects the proceedings of such a body. Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 79 S.Ct. 1237, 3 L. Ed.2d 1323 (1959). In short, Roy failed to show a particular need for examination of the minutes and the district judge did not abuse his discretion under Rule 6. Fed.R.Crim.P. in denying inspection.

■■ Similarly, the district judge did not abuse his discretion in refusing to require the government to disclose the names of its witnesses. United States v. Frank, 23 F.R.D. 145 (D.D.C. 1959); United States v. Lavery, 161 F.Supp. 283 (M.D.Pa. 1958); United States v. Haug, 21 F.R.D. 22 (N.D.Ohio 1957). For retrial, this contention has become substantially moot because Roy has had the benefit of hearing the government's witnesses twice, and he can have access to the records of the district court which show what witnesses were subpoenaed on behalf of the government. Only in a capital case is the government required to furnish a pretrial list of government witnesses. 18 U.S.C.A. § 3432.

Roy's rights to a preliminary hearing as provided in Rule 5, Fed.R. Crim. P., were not denied under the circumstances. Roy was afforded a preliminary hearing after his arrest on April 5. His complaint is that he was not given another preliminary hearing before the Richmond grand jury returned its indictment. The answer is that a preliminary hearing, although it may serve as a vehicle of pretrial discovery for an accused, has as its principal purpose a determination of whether probable cause exists to bind an accused for action by a grand jury. Probable cause had been found in the initial hearing before the Commissioner and the return of an indictment by the Richmond grand jury was a finding that probable cause did exist and obviated the need for another preliminary hearing. United States v. Heap, 345 F.2d 170 (2 Cir. 1965); Nelson v. Sacks, 290 F.2d 604 (6 Cir. 1961), cert. den. 368 U. S. 921, 82 S.Ct. 244, 7 L.Ed.2d 136 (1961). Blue v. United States, 119 U.S. App.D.C. 315, 342 F.2d 894 (D.C. Cir. 1964), cert. den. 380 U.S. 944, 85 S.Ct. 1029, 13 L.Ed.2d 964 (1965), is not to the contrary, because what was said in that case turned on the failure to advise the accused at the preliminary hearing that counsel would be assigned to him, at his request, if he were indigent, as required by domestic law of the District of Columbia. Indeed, the United States Court of Appeals for the District of Columbia Circuit has subsequently recognized that, ordinarily, the return of an indictment constitutes a determination of probable cause and obviates the necessity for a preliminary hearing. Crump v. Anderson, 122 U.S.App.D.C. 173, 352 F.2d 649 (1965).

Finally, our examination of the record satisfies us that there was sufficient evidence, excluding the evidence of events occurring after April 5, to warrant a determination of Roy's guilt by the court. Roy's argument that Carr's testimony, without corroboration, would be insufficient to establish his guilt beyond a reasonable doubt is lacking in merit if, as was peculiarly his function, the district judge, as the trier of the fact, found Carr a credible witness; and Roy's further argument in connection therewith that the failure of the government to call a specific witness who, the government contended, would corroborate Carr, should make applicable the inference that the testimony of that witness would be unfavorable to the government, is equally lacking in merit. In his trial, Roy did not seek to call the witness, whose identity should have been known to him from the record of the subpoenas issued by the government at the first trial, nor did he make any effort to require the government to call that witness. There is no showing that the witness was not equally available to Roy and, therefore, no unfavorable inference arises from the government's failure to call him. Johnson v. United States, 291 F.2d 150 (8 Cir. 1961); Wagner v. United States, 264 F.2d 524 (9 Cir. 1959); Beale v. United States, 263 F.2d 215 (5 Cir. 1959); United States v. LaRocco, 224 F.2d 859 (2 Cir. 1955). See also United States v. Wallace, 300 F.2d 525 (4 Cir. 1962).

Judgment in No. 10,601

Reversed in Part and Affirmed in Part.

Judgment in No. 10,609

Reversed in Part and Affirmed in Part, With New Trial as to First Count.

Judgment in No. 10,728

Reversed, With New Trial.